1

CHIEF JUDGE JOHN C COUGHENOUR
CC TO JUDGE MR

FILED
ENTERED
LODGED
RECEIVED

MAY 28 2003 MR

AT SEATTLE
CLERK US DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

**CR 03 00011 #00000043**

5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6

7

UNITED STATES OF AMERICA, )   NO.  CR 03-11 C

8

Plaintiff, )

9

vs )   DEFENDANT'S
)   SENTENCING MEMORANDUM

10

ABEL NNABUE, )

11

Defendant. )

12

13

14      COMES NOW the defendant, Abel Nnabue,  through his attorney, Assistant Federal

15  Public Defender Omodare Jupiter, and submits the following  memorandum in mitigation

16  of sentencing.

17  **I.    DEFENSE RECOMMENDATION**

18      Mr. Abel Nnabue spent 51 days in custody after his arrest for attempted bank fraud

19  His decision to offend was significantly influenced by a long-standing, unknown bipolar

20  disorder that can be treated with medication and psychotherapy  This court should grant a

21  horizontal  departure  due  to  the  overstatement  of  Mr  Nnabue's  criminal  history  and

22  downward departure due to his diminished capacity  The final sentence should be 51 days

23  incarceration and three years of supervised release with mental health treatment

24  **II.    GUIDELINE CALCULATIONS**

25      Mr  Nnabue pled guilty to one count of bank fraud.  Under  U S S G  § 2B1 1, he has

26  a base offense level of six  We take issue with the eight levels added by U S  Probation for

DEFENDANT'S SENTENCING
MEMORANDUM
(*ABEL NNABUE*) # 03-11 C                     1

1  intended loss (two levels), unauthorized transfer of any means of identification (four levels),

2  and obstruction of justice (two levels) and the denial of any reduction for a mitigating role

3  pursuant to U S.S G. § 3B1 2.  We also submit that a departure for diminished capacity is

4  appropriate  Our arguments against the enhancement are connected to alternative arguments

5  for mitigation and departure  The salient points are as follows·

6  •    Mr  Nnabue never activated the credit cards he received and made no purchases.
       His role in the offense, and knowledge of the scope of this criminal enterprise was
7      limited at the time of his arrest

8  •    The actual loss (0) is grossly disproportionate to the alleged intended loss ($6,000)

9  •    Mr. Nnabue was unaware of how these credit cards would be produced  He should
       not receive a four-level increase for "the unauthorized transfer of any means of
10     identification."  In the alternative, he is entitled to a reduction for a mitigating role

11 •    Mr. Nnabue did not know that Mr. Onwuhuara was going into the Fred Meyer
       shopping center to attempt a bank fraud  His peripheral involvement should not
12     subject him to a two-point increase for intended losses over $5,000.00

13 •    Mr Nnabue's criminal behavior was not planned or executed in a manner where we
       can say at this stage whether he would have been a part of Mr Onwuhuara's scheme,
14     acted on his own, or even abandoned the criminal venture. Consequently, it is just
       as probable to assume that, if he were caught later in this process, his intended loss
15     total would be less than $5,000 00

16 •    Mr Nnabue suffered from a mental disorder that impaired his rationale  His
       decision-making ability at the time he decided to offend and at the time he took
17     flight from armed police officers was severely impaired

18     We will address these points in the body of this memorandum

19 **III.   BACKGROUND**

20     **A.   Childhood in Nigeria**

21     Mr. Abel Nnabue grew up in the Nigeria, West Africa in a close-knit family

22 environment  As the youngest boy, his parents probably favored him more than his sisters

23 On the other hand, as a male child, he was disciplined harshly at home, in school, and in the

24 community.  Much of that discipline came at the hands of his father.  The scars about his

25 head and body are constant reminders of this past  He personally knew people who were

26 physically beaten, stabbed, or even burned for minor criminal infractions  Mr Nnabue

1  vividly remembers his own severe beatings, understanding that this was a socially

2  acceptable practice in Nigeria reinforced in all aspects of society  Public "flogging" is

3  allowed by school teachers and sanctioned by the courts  See Exhibit I  The military and

4  the police certainly practice torture and corporal punishment as well

5      Mr. Nnabue's father was a strong man who provided for the family through fishing

6  He rented boats and hired crews to help catch as many fish as the waters would allow  His

7  father and older brother were hard workers  As a younger sibling in a Nigerian family, Abel

8  was raised to be deferential, if not submissive, to his older brothers and sisters as well as his

9  parents  He was expected to be a provider for the family as he got older

10     **B.    Migration to the United States**

11     Mr Nnabue's brother migrated to the United States in the early 1980's  In 1985,

12 Abel joined him  The family was not pleased with the education and economic outlook in

13 Nigeria  His brother was then his disciplinarian and de facto father  He continued the same

14 pattern of abuse, but then it was more verbal and psychological  Mr Nnabue reported this

15 during a psychological evaluation

16          When he came to the United States at age 11 and took
           residence with his brother and his family, most of the severe
17          discipline ceased although his brother seemed to hold Abel in
           low regard and would frequently tell him that he would never
18          amount to anything

19 Exhibit II  Psychological Evaluation, Dr. Richard Schmitt, p. 1.

20     The Nnabues first stayed in San Antonio and then relocated to the Seattle area  His

21 brother eventually opened a small neighborhood grocery store where he worked as a

22 cashier  Mr Nnabue was 20-years-old but still somewhat of a child to his brother  Mr

23 Nnabue followed his brothers orders for many years but eventually grew tired of being

24 harangued  As he became older, the two began to clash when Abel asserted himself as an

25 adult  Eventually, the business failed and the two went their separate ways

26

DEFENDANT'S SENTENCING
MEMORANDUM
(*ABEL NNABUE*) # 03-11 C                    3

1    **C.    Relocation to Dallas, Texas**

2    Mr Nnabue went to vocational school for his certification as a lab technician  He

3    worked as a technician at Stevens Hospital in Edmonds before he moved to Dallas in the

4    latter part of 2001  After his relationship soured with his brother, he wanted to be close to

5    a family member that would be supportive without being overbearing. His sister, Chi Chi

6    Meringue, was more than happy to provide this  Mr. Nnabue stayed with her family for a

7    short time until he was able to get on his feet  He immediately found work as a laboratory

8    technician and soon moved into his own apartment.

9    **IV.    THE OFFENSE**

10   Mr. Nnabue enjoyed meeting and socializing with other Nigerians living in the

11   Dallas area  He eventually met his co-defendant, Mr  Onwuhuara, at clubs they both

12   frequented  The two were never close but would talk from time to time  Mr  Onwuhuara

13   learned that Abel used to live in Seattle and obviously felt that he would be a valuable

14   partner in his criminal activity.

15   Not too long before the arrest in this case, Mr  Onwuhuara approached Mr. Nnabue

16   about a way to get credit cards. The two met a bartender who apparently had an illicit

17   source employed by Discover. Mr. Nnabue foolishly agreed to go to Seattle with Mr

18   Onwuhuara where they would use fake credit cards and fake IDs to buy merchandise

19   The investigation has clearly shown that this was going to be Mr. Nnabue's maiden

20   voyage  He had yet to learn how everything worked  We concede, however, that he was

21   basically signing up to at least buy things with fake credit cards. He was not yet aware of

22   how this scheme would be carried out.  Mr  Nnabue and Mr. Onwuhuara flew to Seattle and

23   rented a car in Abel's name  Credit cards in their names were sent to a hotel in this area

24

25   The gravity of the situation did not really come across to him until Abel actually

26   received the cards  He did not activate them as Mr. Onwuhuara did and became a bit

DEFENDANT'S SENTENCING
MEMORANDUM
(*ABEL NNABUE*) # 03-11 C                              4

**FEDERAL PUBLIC DEFENDER**
1111 Third Avenue, Suite 1100
Seattle, Washington  98101
(206) 553-1100

1   nervous as his associate began to purchase merchandise   The two stopped at a Fred Meyer

2   shopping center   While Abel knew that Mr Onwuhuara had already used at least one credit

3   card, he did not know then that he was going to the bank located inside to make a cash

4   advance. Abel, who knew the Lynnwood area, went to a convenience store nearby   He

5   returned to the lot outside of the Fred Meyer and waited   As Mr Onwuhuara returned to

6   the car, Lynnwood police officers approached the two of them   One of the officers had a

7   firearm drawn and yelled at him   Mr Nnabue took this to mean that he was going to shoot

8   him and took off in fear of his life. The police chased him through the neighborhood   He

9   eventually came to his senses and pulled into the parking lot of a church where he

10   surrendered.

11   **V.    DIMINISHED CAPACITY DEPARTURE**

12        **A.    Departure in Offense Level**

13        U S S G. § 5K2.13 <u>Diminished Capacity</u> (Policy Statement) states that a sentence

14   below the guideline range may be warranted "if the defendant committed the offense while

15   suffering from a significantly reduced mental capacity." The commentary application note

16   1 defines "significantly reduced mental capacity" to mean that the defendant, although

17   convicted, has a significantly impaired ability to "(A) understand the wrongfulness of the

18   behavior comprising the offense or to exercise the power of reason or (B) control behavior

19   that the defendant knows is wrongful   Such significantly "impaired ability can be caused

20   by an emotional as well as a mental impairment   Emotional conditions, like mental

21   impairments, may distort or suppress the formation of reasoned decisions   <u>United States</u>

22   <u>v Cantu</u>, 12 F 3d 1506, 1512 (9th Cir  1993)

23        In <u>United States v  Cantu</u>, the 9th Circuit determined whether a downward departure

24   based on diminished capacity could apply to a Vietnam veteran who suffered from post

25   traumatic stress disorder. The <u>Cantu</u> court approvingly cited the application by other courts

26   of § 5K2.13 to those suffering from emotional conditions.  <u>Id</u>. at 1512. For example, in

1  United States v. Lewinson, 988 F 2d 1005, 1006-07 (9th Cir 1993), the court approved the

2  application of the guideline to a defendant who suffered from psychological problems

3  Other courts have applied the guideline to defendants suffering from schizo-effective

4  disorder, United States v. Ruklick, 919 F 2d 95, 97 (8th Cir. 1990); bipolar disorder, United

5  States v McMurray, 833 F Supp. 1454, 1480-84 (D Neb. 1993); and schizophreniform

6  disorder, United States v Speight, 726 F Supp 861, 867 (D.D.C. 1989).

7       A defendant is eligible for this departure regardless of the nature or severity of his

8  underlying condition. United States v Cantu, 12 F.3d at 1513 (citing to United States v

9  Lewinson, 988 F 2d 1006-07 (9th Cir 1993). Moreover, the disorder need only be a

10 contributing cause, not a but for cause, or a sole cause, of the offense. United States v

11 Cantu at 1515 citing United States v Soliman, 954 F 2d 1012, 1014 (5th Cir. 1992)

12      Mr Nnabue has never received any treatment for his lingering depression. His

13 decision to get involved in this criminal venture was clearly linked to long standing

14 emotional issues regarding his self-image. Dr Richard Schmitt, a clinical psychologist in

15 Texas, summarizes that Abel was "amenable to participate in a criminal act to prove his

16 brother wrong and to elevate his material status so as to make a favorable impression of his

17 romantic partner " Exhibit II, p. 2  At the time of the offense, Mr Nnabue was suffering

18 from bipolar disorder that is now in "sustained remission." Id at 3  While his past acts

19 suggests that his behavior was mired in "unpredictable mood swings," and self-destructive

20 conduct, his prognosis with mental health treatment and medication is positive. We suggest

21 that the court depart three levels downward.

22      **B.   Significance of Mental Health Disorder in Flight Enhancement**

23      Mr. Nnabue's cultural background also played a significant role in his decision to

24 take flight when police officers arrived  As Dr. Schmitt reports

25              Abel still has vivid memories of what happened to
             thieves in Nigeria who got caught  Among these memories are
26           that of a man who had a tire put around his neck who was set

DEFENDANT'S SENTENCING
MEMORANDUM
(*ABEL NNABUE*) # 03-11 C                       6

on fire, of another who was stoned to death, and of another
caught by one of his uncles who hacked a thief with a machete
as he tried to run away   In Nigeria, retribution was both swift
and vicious

Id. at 2   While his initial decision to drive away from the police appears irrational, it was

a choice motivated by his own fear of death– based on childhood experiences   The court

should therefore consider a departure if it decides that the enhancement for flight over

represents Mr. Nnabue's conduct

## VI.   MITIGATING ROLE IN THE OFFENSE AND OTHER CONSIDERATIONS

### A.   Mr. Nnabue's Involvement was Still Peripheral at the Time of Arrest

The sentencing guidelines provide a four level reduction for minimal participant in

any criminal activity and a two level reduction for a minor participant.  U S S G  § 3B1.2

A minimal participant is one whose role is the least culpable among a group of offenders,

and who lacks knowledge or understanding of the scope and structure of the criminal

enterprise  Id  at comment., n  4  A minor participant is also less culpable, but has a role

that can not be designated as minimal  Id  at n  5

Mr  Nnabue qualifies for at least a two level reduction here  He was arrested shortly

after receiving these credit cards– before he had an opportunity to understand the scope and

structure of this criminal enterprise  He never had experience or knowledge with this type

of criminal activity before and his will to follow through with the offense will never be

known  We only know that he came to Seattle and that he did receive the credit cards and

fake IDs. Something caused him to pause before activating the cards while Mr Onwuhuara

was using the ones sent to him.  We do not know whether seeing Mr. Onwuhuara use the

cards brought him closer to doing it himself or whether witnessing the crime actually was

encouraging him to abandon it  Upon review of the psychological evaluation, we know that

his mental state caused unpredictable behavior  Consequently, we do not have a pattern of

behavior to determine that his role was significant  At the time of arrest, his role was minor

1   He did not know how the credit cards were made, how many were sent, or that he could get

2   a cash advance

3   **B.   Error in the Probation Office's Analysis of the Scope of Criminal Activity**

4

5   In its recommendation, U.S. Probation suggests that a reduction for a mitigating role

6   would be inappropriate because Mr. Onwuhuara "was involved in additional conduct

7   beyond that which Mr Nnabue was involved." Addendum to Presentence Report, p 2

8   This analysis is incorrect in a situation where an offender is a newcomer to a criminal

9   enterprise. In fact, Mr. Nnabue is being punished for the full scope of Mr Onwuhuara's

10  activities that occurred in the short time that he was associated with him, not just the

11  activities that he was directly and personally involved  Other criminal activities committed

12  by Mr Onwuhuara in Texas and Oregon are not relevant to this case as they occurred prior

13  to Mr. Nnabue's association with the criminal venture.

14  The analysis that Probation alludes to would be relevant if, for example, Mr Nnabue

15  was associated with Onwuhuara's criminal venture much earlier but never made any

16  purchases. This is not the case here  Mr Nnabue just joined the venture and was still

17  unaware of the scope and structure  There is no evidence that he *specifically* knew that Mr

18  Onwuhuara was going to attempt a cash advance in the Fred Meyer Shopping Center. This

19  is a unique case to the extent that Mr Nnabue was arrested by law enforcement before he

20  actually used the credit cards that he received  While we agree that this should not reduce

21  his culpability, we submit that it should not increase his exposure either   For example, if

22  Mr. Onwuhuara was able to get the cash advance at Washington Mutual undetected and Mr.

23  Nnabue then made a cash advance for $1,000.00 using one or both of the credit cards he

24  had, we would probably attribute separate losses to each of them as long as they were not

25  being charged with conspiracy  The question of whether the two were committing crimes

26  together or separately was still unclear at the time that they were arrested  Their common

FEDERAL PUBLIC DEFENDER
1111 Third Avenue, Suite 1100
Seattle, Washington  98101
(206) 553-1100

1  interest in flight does not settle this issue and should not be resolved to Mr Nnabue's
2  detriment
3      WHEREFORE, for the foregoing reasons, we ask that the Court adopt our
4  recommendation for Abel Nnabue of 51 days of incarceration, three years of supervised
5  release, with mental health treatment
6      DATED this 28th day of May, 2003

8                              Respectfully submitted,

10                             Omodare Jupiter
11                             Attorney for Abel Nnabue

DEFENDANT'S SENTENCING
MEMORANDUM
(*ABEL NNABUE*) # 03-11 C                    9

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on May 28, 2003, I caused to be faxed and hand delivered a

3    copy of the DEFENDANT'S SENTENCING MEMORANDUM, to:

4

5        Mr. Lawrence Lincoln
         Assistant United States Attorney
6        601 Union Street, Suite 5100
         Seattle, WA    98101-3903
7        Fax No   (206) 553-0755

8
and by fax and U.S. Mail, with proper postage affixed, to.
9
         Tammy M  White
10       United States Probation Officer
         701 Fifth Avenue, Suite 4100
11       Seattle, WA    98104
         Fax No.  (206) 553-0624
12

13
     DATED this 28th day of May,  2003
14

15

16

17

18   Barbara G. Hughes

19

20

21

22

23

24

25

26

DEFENDANT'S SENTENCING
MEMORANDUM
(*ABEL NNABUE*) # 03-11 C                          10

FEDERAL PUBLIC DEFENDER
1111 Third Avenue, Suite 1100
Seattle, Washington  98101
(206) 553-1100

# EXHIBIT   I

<u>Introduction</u>     <u>Children's views</u>     <u>Effects</u>

<u>Surveys</u>

<u>Reports</u> and papers



*Global Initiative to*
**End All Corporal Punishment
of Children**

# HOW OFTEN ARE CHILDREN HIT

### Surveys in the 1980s/1990s have found:

**Barbados** 70 per cent of parents "generally approved" of corporal punishment and of these 76 per cent endorsed beating children with belts or straps

**Chile** a 1995 survey found 80 per cent of state school parents and 57 per cent of private school parents admitting using physical punishment

**Egypt** large-scale 1996 survey of children found over a third were disciplined by beating - often with straps or sticks, a quarter of these children reported that discipline led to injuries

**India** a survey of university students found that 91 per cent of males and 86 per cent of females had been physically punished in their childhood

**Korea** survey by Child Protection Association found that 97 per cent of children had been physically punished, many severely

**Kuwait** a 1996 survey of parents' attitudes found 54 per cent agreeing, or strongly agreeing, with severe beating in cases of gross misbehaviour 9 per cent of parents agreed with burning as a form of punishment

**Romania** 1992 survey found 84 per cent of parents regarded spanking as "normal" method of childrearing 96 per cent did not consider it humiliating

**UK** Government-commissioned research in the 1990s found that three quarters of a large sample of mothers admitted to smacking their baby before the age of one In families where both parents were interviewed, over a third of the children - 35 per cent - were hit weekly or more often by either or both parents, and a fifth of these children had been hit with an implement

**USA** 89 per cent of a large sample of parents had hit their 3 year-old child in previous year, about a third of 15 - 17 year-olds had been hit

Top

## Summaries of reports and papers

Nigeria | Kuwait | Chile | Egypt | Pakistan | Hong Kong | UK | US | Barbados

### Nigeria

"Two deaths, one blind eye, one imprisonment  child abuse in the guise of corporal punishment in Nigerian schools"

A "brief communication" published in the international journal *Child Abuse and Neglect* in 2000 describes media reports of two recent cases in which school students have died as a result of school corporal punishment  a 15 year old died two weeks after being "flogged on the head by his schoolteacher" (*Sunday Tribune*, February 23, 1997)  the boy had failed to submit an assignment and had warned the teacher not to flog him on the head  A 17 year-old student was flogged to death by his schoolmistress  The *National Concord*, March 10 1998, reported that "the flogging took place in the heat of the day in the field, and the teacher continued until the child collapsed, he died in hospital a few hours later"

The communication also records two high level court decisions in Nigeria which have condoned corporal punishment  In 1991 the Nigerian Supreme Court dismissed a claim for damages from a child whose eye was permanently damaged by corporal punishment  "There was an incident of theft in the neighbourhood of the school  The culprit was apprehended and the crowd that gathered started to beat him  The appellant, the child's class teacher, instructed his pupils to go and watch how thieves were treated so that they could learn a lesson or two  The pupils complied with the instruction and ran up to watch  A while later the school bell was rung calling the pupils back to class  As the pupils ran into the class, the teacher whipped them indiscriminately  Unfortunately, one of the whips was discharged across the face of the plaintiff  The whip landed on her eye and she cried out in pain and anguish and collapsed  The eye was permanently damaged as a result  The teacher was not arrested and charged as an offender, rather the child sued for the civil remedy of damage"  The Supreme Court held the teacher was not liable: "What happened in this case was nothing more than the appellant discharging his duty and it was only by shere accident that the respondent was hit on the left eye resulting in its damage" *(Ekeogu v Aliri  Nigeria Weekly Law Report, 1991)*

In another case a schoolteacher invited a pupil to her apartment after school to wash dishes and sweep the apartment  Later, the teacher discovered that money was missing  She flogged the pupil and locked her up for hours as a means of compelling her to own up to the stealing  The student's case for damages was dismissed by the court on the grounds that the teacher's action was protected by a section of the Constitution which empowers teachers to deprive students of their personal liberty in accordance with a procedure permitted by law for the purpose of the child's education (*Florence Olusa v Commissioner of Education, Ondo State and Marian Olaniyan, High Court of Nigeria Law Report, 1985, 1133)*

*Two deaths, one blind eye, one imprisonment  child abuse in the guise of corporal punishment in Nigerian schools, Emeka Chianu, Child Abuse and Neglect, Vol  24, No  7, pp  1005 — 1009, 2000*

Top

# EXHIBIT II

**RICHARD C. SCHMITT, Ph. D.**
**Clinical Psychologist**
**1001 West Mitchell Street, Suite 101**
**Arlington, Texas 76013**
**(817) 265-1221          Fax: (817) 299-8572**

May 23, 2003

Omodare Jupiter, Assistant Federal Public Defender
1111 Third Avenue, Room 1100
Seattle, WA. 98101

Re· United States v. Abel Nnabue
Cause no. CR 03-11 C

Dear Mr Jupiter

I am writing to provide the results of my psychological evaluation of your client, Abel Nnabue. Abel is a 28-year-old single black male who is a naturalized citizen who arrived in the United States at age 11 to live with an older brother who was already living in this country. He lived with his brother and his family, first in San Antonio until Abel was age 15, and then in the Seattle area until age 26 when he moved to the Dallas area to live. His mother and other siblings consisting of four sisters remain in Nigeria.

Abel is charged with attempted bank fraud, one count, following his arrest in Seattle on or about December 10, 2002. He was released from detention on February 1, 2002, and subsequently returned to the Dallas area and is living with his sister and her family in Mesquite. He expects to plead guilty to this offense and return to the Seattle for a sentencing hearing in this matter which has been set for May 30, 2003.

Abel was born in Lagos to an intact family which included an older brother and five sisters. He was the second youngest and attended elementary school in Nigeria from age six to age ten. Both his parents worked long hours and his older siblings provided after school care until his parents would return home in the evenings. He had a close and nurturing relationship with his mother but was subjected to harsh physical punishment by his father and by his older siblings, particularly his brother. Any misbehavior on his part resulted in consequences ranging from being hit with fists, belts, wire, or most anything that was handy. To this day, he still carries scars on his back, shoulders, and head from beatings, some of which were so severe that he became barely conscious. In retrospect he believes that these beatings were consistent with cultural standard and was not necessarily personal.

When he came to the United States at age 11 and took residence with his brother and his family, most of the severe physical discipline ceased although his brother always seemed to hold Abel in low regard and would frequently tell him that he would never amount to

2

anything. Abel completed high school and entered college although he withdrew after a short time to work in various businesses owned by his brother in the Seattle area. His last job in Seattle was working in a convenience store that his brother owned. Abel has had a relationship for the past five years with a woman who recently graduated law school that he hopes to marry. In essence, he became amenable to participation in a criminal act to prove his brother wrong and to elevate his material status so as to make a favorable impression on his romantic partner.

While living in the Dallas area, Abel became acquainted with other men from Nigeria who lived here. After securing work as a lab technician and moving out on his own, one of the Nigerian friends approached him about a scheme to obtain a credit card and both Abel and the accomplice obtained false drivers licenses with their photographs and the names of the card-holder victimesbel had two stolen cards and two corresponding fake photo identifications which were never used. He and his accomplice moved to the Seattle area and rented a car While driving through a local Seattle community, his accomplice entered a retail store and his accomplice attempted to get a five thousand dollar cash advance on one of the stolen credit cards. This request was rejected and the police were called, arriving at about the same time as his accomplice entered the car to be picked up. One of the officers drew his weapon and ordered Abel to get out of the car. Fearing that he might be shot, Abel drove away from the scene with the police in pursuit, eventually turned into a nearby church parking lot, and surrendered. His accomplice ran from the police and was later arrested after being discovered by a police dog.

Abel still has vivid memories of what happened to thieves in Nigeria who got caught. Among these memories are that of a man who had a tire put around his neck who was set on fire, of another who was stoned to death, and of another caught by one of his uncles who hacked a thief with a machete as he tried to run away. In Nigeria, retribution was both swift and vicious. While he is well aware that the United States is a different culture, primitive emotions from his past more influenced his behavior in trying to escape than did his awareness that the justice system in this country is of a different sort.

Psychological testing results indicate the profile of a man who has had a history of disappointments in personal and family relationships. Deficits in his personal attainments are notable including a tendency to participate self-defeating vicious circles. Earlier hopes have resulted in frustrating setbacks and efforts to achieve the consistent niche in life have failed. While Abel is usually able to function on a satisfactory ambulatory basis, he will experience periods of marked emotional, cognitive, and behavior dysfunction.

Abel's behavior is typified by highly variable and unpredictable moods, and embittered and resentful irritability, and untrusting and pessimistic outlook, and feelings of being misunderstood and unappreciated. He anticipates being disillusioned with others, and for this reason, often behaves obstructively, thereby creating the expected disappointment. Although deeply untrusting and fearful of domination, he is also prone to be naive and subject to being lead into situations that can easily backfire if her perceives the other person as treating him with civility, respect, or kindness. The resentment and guilt in a conflict between dependency and self-assertion permeate all aspects of his life. He

3

displays an unpredictable and rapid succession of moods, is restless, and erratic, and tends to be easily nettled and offended by trifles. He feels misunderstood and unappreciated, and tends to be touchy, defensive, and suspicious. He fears displaying weakness, however, since it is seen as a confession that others may use maliciously.

Abel's responses suggest that he is subject to manic episodes of an expansive and suspicious character rather than those of a euphoric and cheerful variety. He is likely to be talkative, restless and distractible, guarded, excitable, and interpersonally disruptive By history, he has been involved in the past in the abuse of cannabis and alcohol. He admits to a past DUI on his record, this being the only time he has previously been convicted of a criminal offense He was however, using marijuana on a regular basis until just prior to his arrest, but denies any further use of substances since his release from incarceration. Most likely, his past use of substance gave him a sense of freedom from feelings of ambulance towards himself and others.

I am diagnosing Abel with Axis I disorders of Bipolar II Disorder, Mixed Type (296.89) and with Psychoactive Substance Abuse NOS (305.90) in sustained remission. No other diagnoses are offered at this time. It is my professional opinion that the commission for the crime for which Abel is charged is one where psychological dynamics played a prominent role in his offense. No doubt the impact of his negative emotions clouded his judgment and psychological treatment, including targeted antidepressant and mood stabilizing medication, is in order. That he took this risk in first place is also based on a misplaced desire to prove himself and to prove wrong his detractors who have demeaned him over the years. These are problems with his though process that psychotherapy should be able to successfully address in the future. It is also my professional opinion that Abel is not basically inclined or comfortable with criminal behavior, and that the likelihood of him committing the same or similar actions in the future is unlikely.

Thank you for this most interesting referral. If there are further questions or if I can be of further assistance, please do not hesitate to contact me.

Sincerely,

Richard C. Schmitt, Ph.D.
Clinical Psychologist
TSBEP #2-0871

# EXHIBIT   III

1417 Paula Ln
Mesquite TX
75149

From, Chichi Nnabue Meregini
To: Omodare Jupiter

How are you doing today? Fine I hope. Unfortunately, I will not be able to make the sentencing of my younger brother, Abel Nnabue due to work constraints. However, I would like to apologize for my younger brother's behavior, I don't know what happened to my brother, but I believe that he was misled by his peers. Abel has been an honest, dependable, easy-going young man and I don't know how he got involved in this case. I am asking you to please be lenient on him. My mother does not even know about this case, and I am hoping that when this is finally resolved I will let her know.

When my father passed away back home, Abel became the sole-provider for her and other siblings so everyone looks up to him for assistance and support. All in all he is a very responsible gentleman, I hope you find it in your heart to forgive him.

I thank you for your sincere efforts in trying to help my younger brother with this case. May the good lord continue to bless you in all your endeavors.

Sincerely yours,
Chichi Meregini